**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

ANNE DIRKSE,

      Plaintiff,

v.

ALTICAST INC.,
ALTICAST CORP., and
ALTICAST CORP, U.S.

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Anne Dirkse, by and through counsel, Mari Newman, Darold W. Killmer, and Nicole B. Godfrey of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for her Complaint and Jury Demand as follows:

## I.  INTRODUCTION

1.  Plaintiff Anne Dirkse, an American female, successfully served Defendants Alticast, Inc., Alticast Corp., and Alticast Corp., U.S., (referred to herein collectively as "Alticast") as a dedicated and excellent employee for three and a half years. In January 2012, Alticast commenced a sizeable rebranding and marketing effort. As part of this effort, Alticast sent Ms. Dirkse to the company's office in Seoul, Korea to lead the project. The project was extraordinarily successful and quickly morphed into a long-term assignment in Seoul.

1

2.      Unfortunately, Ms. Dirkse's successful employment with Alticast was cut short after her transfer to the Korea office. Immediately upon arrival in Korea, Ms. Dirkse began experiencing obvious and intentional discrimination and retaliation because she was an American woman working in South Korea. Despite repeated complaints to Alticast's Human Resources departments in both Seoul and Colorado, Alticast took no steps to stop the illegal discrimination and retaliation. After enduring months of hostile treatment, Ms. Dirkse could not longer endure the harassment she experienced in Korea and left with no choice but to resign her position with Alticast. Defendants' illegal discrimination, retaliation, and constructive discharge of Ms. Dirkse's employment was willful and intentional, and caused Ms. Dirkse to suffer significant injuries, damages and losses.

## II.      JURISDICTION AND VENUE

3.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized and instituted pursuant to 42 U.S.C. § 1981.[1] Jurisdiction supporting Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## III.      ADMINISTRATIVE PREREQUISITES

5.      Plaintiff timely filed a Charge and Amended Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which Charge is currently being

---

[1] Upon exhaustion of Plaintiff's administrative prerequisites through the Equal Employment Opportunity Commission, this action will also be authorized pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq*.

processed by the Commission.  Upon the EEOC's issuance of a notice of Right to Sue, Ms.

Dirkse anticipates adding claims of discrimination and retaliation pursuant to Title VII.

## IV.    PARTIES

6.      Plaintiff Anne Dirkse is a citizen of the United States and a resident of the State of

Colorado.  At all times referred to herein, Ms. Dirkse was employed by Alticast, Inc., Alticast

Corp., and Alticast Corp, U.S. (collectively referred to herein as "Alticast").

7.      Defendants Alticast, Inc., Alticast Corp., and Alticast Corp., U.S. have principle

offices and registered agents in Broomfield, Colorado.

8.      Alticast, Inc. is a Colorado corporation with its principal place of business in

Broomfield, Colorado.

9.      Alticast Corp. is a Korean corporation that is registered as a corporation doing

business in Colorado with the Colorado Secretary of State and listed its principal place of

business in Broomfield, Colorado.

10.     Alticast Corp., U.S., is a Colorado corporation with its principal place of business

in Broomfield, Colorado.

11.     Defendant Alticast has continuously been an employer within the meaning of

Title VII at all times relevant to this Complaint.

12.     Defendants Alticast, Inc., Alticast Corp., and Alticast Corp., U.S. operate as a

single entity and are a "single employer."

a.      Anne Dirkse received an offer of employment from Jeffrey Bonin, SVP

Business Development for Alticast, Inc. on December 16, 2009. The offer

3

of employment was sent on letterhead that simply said "Alticast" and listed

www.alticast.com as the company's website.

b.    Alticast Corp. holds the copyright to the Alticast website.

c.    The Alticast website's "Management" page lists the top executives from

both Alticast Corp. and Alticast, Inc., and its "Contact" page lists contact

information for Alticast Corp.'s office in Seoul and Alticast, Inc.'s office

in Colorado.

d.    Alticast, Inc.'s employee handbook refers to the two entities collectively as

"Alticast," lists its locations around the world, and states that the company

has over 250 employees.

e.    The same individual completed both entities' most recent periodic report

to the Colorado Secretary of State.

f.    Throughout Ms. Dirkse's employment with Alticast, her position

fluctuated between assignments in an Alticast, Inc. position and an

Alticast Corp. position, and her direct supervisor fluctuated between an

Alticast, Inc. employee and an Alticast Corp. employee. The following

chart illustrates the overlapping nature of the two entities as it specifically

related to Ms. Dirkse's employment:

| Relevant Time Period | Ms. Dirkse's Stated "Employer" | Ms. Dirkse's Direct Supervisor | Ms. Dirkse's Direct Supervisor's Employer |
|---|---|---|---|
| Jan 2010-Feb 2010 | Alticast, Inc. | Jeff Bonin | Alticast, Inc. |
| Feb 2010-Dec 2010 | Alticast Corp. | Jeff Bonin | Alticast, Inc. |
| Dec 2010-May 2011 | Alticast Corp. | James Ryu | Alticast Corp. |
| May 2011-Sept 2011 | Alticast Corp. | Mike Malcy | Alticast, Inc. |
| Sept 2011-Oct 2011 | Alticast, Inc. | Mike Malcy | Alticast, Inc. |
| Nov 2011-Aug 2012 | Alticast, Inc. | Thomas Jung | Alticast Corp. |

g.     In January of 2012, Alticast commenced a sizeable rebranding and

marketing effort and sent Ms. Dirkse to Seoul to lead the project, where

she utilized the resources and personnel of Alticast Corp.'s marketing

team. As a part of her employment at the Seoul office, Alticast, Inc.,

initially authorized Ms. Dirkse's use of its corporate credit card for meals,

transportation, and Korean language courses.

h.     Until July 2012, Alticast, Inc. issued Ms. Dirkse's paycheck and provided

her with a benefits package, even while she was assigned to work in the

Alticast Corp. office in Seoul.

i.     From January 2012 until July 2012, Ms. Dirkse negotiated the terms of her

continued employment with both Alticast Corp. and Alticast, Inc.  In

addition, Ms. Dirkse reached out to and received assistance from both

Alticast Corp.'s and Alticast, Inc.'s human resources departments regarding the discrimination she experienced in 2012, as set forth more fully herein.

j.   Throughout Ms. Dirkse's employment, Alticast, Inc. and Alticast Corp. effectively operated as a single entity. For this reason, the two entities should be treated as a single employer for purposes of Title VII and other relevant laws.

## V.   FACTUAL ALLEGATIONS

12.   Anne Dirkse began working for Alticast in the company's Broomfield, Colorado office in January of 2009 as the Director of Technical Strategy and Product Solutions.

13.   Throughout her employment with Alticast, Ms. Dirkse earned annual performance bonuses and VIP travel privileges based on her personal contributions and accomplishments within the company.  Ms. Dirkse received consistently positive feedback on her work product and did not receive a single reprimand or other written corrective action from Alticast.

14.   As Director of Technical Strategy and Product Solutions, Ms. Dirkse was responsible for bridging the gap between engineering and marketing. Alticast assigned Ms. Dirkse with the important task of aligning the company's product strategy with global market conditions. To accomplish this task, Ms. Dirkse monitored market conditions in Korea, the United States, Europe, the Middle East, Africa and Latin America in order to focus Alticast's efforts on new product initiatives that could accurately and effectively be marketed to a global audience.

15.     On January 18, 2012, as part of Alticast's "globalization initiative," the effort to rebrand and market the company for a more global audience, the company sent Ms. Dirkse to Seoul, Korea.

16.     Ms. Dirkse was originally scheduled to return to Broomfield, Colorado in February of 2012.  However, Alticast's Chief Marketing Officer, Thomas Jung, asked Ms. Dirkse to remain in Korea for the foreseeable future and to lead the Korean marketing team's product material design and website design.  Alticast instructed Ms. Dirkse  to utilize marketing team resources and personnel to accomplish her tasks and to report directly to Mr. Jung.  Mr. Jung and Alticast Chief Executive Officer, Woncheol Kang, also agreed that, given Ms. Dirkse's limited knowledge of Korean, all business would be conducted in English when Ms. Dirkse was present.

17.     Ms. Dirkse agreed to stay in Korea and take on the responsibilities that Alticast had requested of her until her project was finished, and, at Alticast's request, Ms. Dirkse canceled her return flight back to the United States.  Ms. Dirkse immediately began working in Seoul utilizing a three-month tourist visa.

18.     To Ms. Dirkse's surprise, Alticast's Korean staff, and particularly her direct report Wonseok Jang, Senior Manager of the Marketing Division, were very hostile to Ms. Dirkse's transition to the Korean office.

19.     To make matters worse, Alticast tolerated and endorsed the hostile work environment created by the company's Korean staff, which made it patently obvious that they did not want an American employee in their workplace, much less a female one.

*__Alticast Manager, Wonseok Jang, Excluded, Discriminated Against, and Retaliated Against
Ms. Dirkse because She Was an American Woman Working in South Korea__*

20.      As part of her long-term assignment in Korea, Alticast directed Ms. Dirkse to

supervise the company's global rebranding and marketing initiative.  This required Ms. Dirkse to

work with many teams on the engineering side of the company to gather information, define

product roadmaps, and understand technical implementation and customer engineering

requirements.  Ms. Dirkse also oversaw the Marketing group in Seoul, which was tasked with

implementing most facets of the global rebranding and marketing initiative.

21.      In her position, Ms. Dirkse was required to work closely with Wonseok Jang,

Alticast's Senior Manager of the Marketing Division.

22.      Although Ms. Dirkse's director position was, in title, higher than Mr. Jang's in the

company, Mr. Jang refused to treat Ms. Dirkse with any respect whatsoever because she is an

American woman.

23.      Mr. Jang repeatedly made a point of highlighting that Ms. Dirkse did not belong

in Korea, derisively referring to Ms. Dirkse as an "American Director" both in one-on-one

conversations and in front of staff. Mr. Jang made clear that, in his view, an "American Director"

is a much lower position than a Korean "Manager".

24.      All Korean Alticast employees condescendingly referred to Ms. Dirkse as a

"foreigner," which has a slightly different (and more negative) connotation in Korea than it does

in the United States. The Korean word for "foreigner" means "non-Korean" in an ethnic sense,

and is applied equally to all people that do not have "Korean blood."

25.     In addition to perpetually referring to Ms. Dirkse as a "foreigner," or not of the pure Korean race, Mr. Jang regularly yelled, intimidated, and threatened Ms. Dirkse in front of other staff members and isolated her within the company.

26.     Almost immediately after Ms. Dirkse agreed to stay in Korea, several male Alticast employees, including Mr. Jang and Mr. Jung, demonstrated a significant lack of respect towards Ms. Dirkse and her sister, both American female employees working in Korea, by humiliating them and likening them to prostitutes.  During a company dinner to welcome Anne Dirkse's sister Sara to Korea, where she was also a contract employee for Alticast, Mr. Jang and other Korean male Alticast employees brought Ms. Dirkse and her sister to a "hostess bar," a bar in which the "hostesses" are hired by businessmen as companions for anything from casual conversation to sex.  Unbeknownst to Ms. Dirkse at the time, her presence at the hostess bar conveyed the message to those around her that she was a prostitute. While Ms. Dirkse did not learn this cultural truth until later, her male, Korean, Alticast colleagues and supervisors knew what her presence signaled to other bar patrons.

27.     Unfortunately, this company excursion to a hostess bar was not a one-time incident, and her male, Korean colleagues often placed her in this vulnerable position. This embarrassed and humiliated Ms. Dirkse after she learned the implications of patronizing a "hostess bar," and her multiple trips to these places had a lasting effect on her reputation at Alticast.

28.     Mr. Jang's hostility towards Ms. Dirkse became even more overt beginning in February of 2012, after Ms. Dirkse rebuffed Mr. Jang's sexual advances.  Shortly after beginning

her long-term assignment in Korea, Ms. Dirkse joined Mr. Jang and a group of her co-workers to celebrate his birthday at a local restaurant.  As they were leaving the restaurant, Mr. Jang stated to Ms. Dirkse, "You are nicer to me than my wife," and grabbed her hand. Other Alticast staff members who observed Mr. Jung's conduct later commented to Ms. Dirkse that Mr. Jang's behavior was incredibly improper because, in Korean culture, the act of a man grabbing the hand of a woman is a very forward gesture of intimacy.  Ms. Dirkse quietly pulled her hand away from Mr. Jang, in an effort to avoid disrespecting and embarrassing him.  Mr. Jang, however, became outraged by Ms. Dirkse's lack of responsiveness to his overture and determined to drive her from the company.

29.     Following this event at Mr. Jang's birthday celebration, Mr. Jang began excluding Ms. Dirkse from workplace emails and meetings and directly confronting, intimidating, and yelling at her whenever possible.  Mr. Jang's behavior severely escalated over the next several months, rendering it impossible for Ms. Dirkse to effectively perform her job.

30.     A few weeks after Mr. Jang's birthday dinner, in March of 2012, Mr. Jang informed Ms. Dirkse during a team meeting that he was reassigning all marketing resources and that Ms. Dirkse would no longer have access to those resources.  Ms. Dirkse suggested that she and Mr. Jang raise the resource issue with their direct supervisor, Mr. Jung.

31.     Instead of agreeing to discuss the resource issue with his supervisor – and demonstrating the true power dynamic within the company – Mr. Jang rudely yelled at Ms. Dirkse, "You don't think you work for me?"  Unsatisfied with Ms. Dirkse's response, Mr. Jang

followed Ms. Dirkse back to her office, shut her door, and yelled at her. He threatened to have her sent back to America because he did not like working with a foreigner.

32.     In an effort to remedy the situation, Ms. Dirkse met with Mr. Jung to confirm her role and position within the company, especially in regard to Mr. Jang's repeated insistence that an "American Director" ranked lower than a Korean "Manager" and that Ms. Dirkse was in Korea to work *for* him.  Mr. Jung confirmed that Ms. Dirkse, as a Director, was ranked above Mr. Jang. Mr. Jung promised to talk to Mr. Jang about the situation.

33.     Unfortunately, rather than causing Mr. Jang to work more productively with Ms. Dirkse as his superior, the humiliation caused by Ms. Dirkse's report to Mr. Jung led Mr. Jang to further marginalize Ms. Dirkse in Alticast's Seoul office.

34.     Only a few days after Ms. Dirkse's discussion with Mr. Jung, and in retaliation against Ms. Dirkse for reporting his inappropriate behavior, Mr. Jang attempted to evict Ms. Dirkse from her office, directing her to choose a cubicle space among those allocated for his staff members instead of continuing to occupy her private office. Moreover, Mr. Jang ordered his staff to utilize Ms. Dirkse's office as a storage area. When Ms. Dirkse declined to move from her private office to a cubicle, Mr. Jang became angry and yelled at her again.

35.     Concerned about staying in Korea on a long-term basis in light of Mr. Jang's continuing and increasing hostility toward her, Ms. Dirkse emailed her direct supervisor, Mr. Jung, on April 1, 2012 stating, "Everyone I talk to is telling me that they hear I am moving to Korea, but we only discussed the possibility . . . as you know.  I am willing but I really want to understand the circumstances and my role before I commit.  There are some big issues and they

seem to be getting worse-not-better in many cases; I want to be sure that there is a path to resolve them."

36.     The next day, Mr. Jung responded to Ms. Dirkse in person, advising her that she could communicate directly with the Korean Human Resources Department regarding her role and position within the company.

37.     Inexplicably, Mr. Jung also tasked Mr. Jang, the very person whose behavior had prompted Ms. Dirkse to express her concerns to Mr. Jung,  with assisting Ms. Dirkse in communicating with the Human Resources Department.  The Seoul Human Resources Department at Alticast had very few employees with limited English skills. Therefore, Mr. Jang was required  to serve as a liaison  and translator between the Human Resources Department and Ms. Dirkse. In this role, Mr. Jang needed to assist Ms. Dirkse in finding long-term housing and obtaining a work visa, residence card, and other household essentials. Mr. Jang's obvious and aggressive hostility towards Ms. Dirkse made this situation obviously untenable.

38.     On April 17, 2012, Ms. Dirkse received an email from Mr. Jung confirming the upcoming announcement of her long-term relocation to the Korean office, stating that her "new position in HQ will be announced soon.  Your title will be the same as the current one, (i.e. Director of Technical Strategy and Product Solutions)."

39.     Still facing overt hostility from Mr. Jang, Ms. Dirkse *again* reached out to Mr. Jung on April 18th in an effort to resolve the persistent problems, stating, "Hi Thomas, When you have a chance I would like to talk about this week because I am concerned that if things keep going the way they are that the result will be negative for everyone involved."

40.     When Ms. Dirkse spoke with Mr. Jung, she *again* asked him to take action to address Mr. Jang's abject unwillingness to treat her as even an equal, let alone his senior.  Ms. Dirkse also informed Mr. Jung that Mr. Jang had subjected her to several angry outbursts, had attempted to turn her office into a storage room, and had advised the marketing team not to assist Ms. Dirkse in any projects. Mr. Jung said he would speak to Mr. Jang to address this issue.

41.     Instead of improving the situation, however, Mr. Jung's conversation made it materially worse.  Mr. Jang became visibly upset, telling Ms. Dirkse that he no longer supported her move to Korea and would continue to refuse to make resources available to her. Thereafter, Mr. Jang prohibited the marketing team not just from providing professional assistance to Ms. Dirkse but also from even having lunch or otherwise socializing with her. Mr. Jung used every means available to solidify Ms. Dirkse's status as an outcast

42.     As Mr. Jang's inappropriate, condescending and unlawful treatment towards Ms. Dirkse continued to escalate, other Alticast employee's discriminatory treatment did, as well. Mr. Jung often told Ms. Dirkse that he was happy she was in the Korea office because she stirred discussion amongst the almost exclusively Korean employee base.  Mr. Jung himself made biased comments regarding Ms. Dirkse, specifically noting his surprise that Ms. Dirkse had such an admirable work ethic because he believed that most Americans did not work hard.

### *Alticast Materially Changed the Terms and Conditions of Ms. Dirkse's Employment*

43.     At the same time that Mr. Jang was unlawfully discriminating against Ms. Dirkse, Alticast began systematically withdrawing material benefits the company had previously provided and promised to her.

44.     Before Ms. Dirkse began her long-term assignment in Korea, Alticast had provided her VIP travel privileges that permitted her to book business class airfare for any flights longer than five hours utilizing the company credit card.  Alticast also previously reimbursed Ms. Dirkse for all meals and transportation and provided a one bedroom apartment at Coatel, a location within walking distance to the Alticast office in Seoul. Coatel also had daily housekeeping service and a twenty-four hour English speaking concierge who could assist Ms. Dirkse with day-to-day living necessities.  Alticast provided these company privileges to Ms. Dirkse prior to her move to Korea as one of the perks of her employment and extensive, required travel. Alticast never informed Ms. Dirkse, and Ms. Dirkse had no reason to believe that Alticast would unilaterally cancel these important terms and conditions of her employment when she agreed to stay in Korea on a long-term basis.

45.     As an American working in Korea under a tourist visa, not a work visa, Ms. Dirkse was ineligible for a Korean phone plan or ATM card.  Therefore, Ms. Dirkse could only withdraw money by entering a bank to the make the withdrawal in person. Due to the inconvenience posed by this banking situation, Alticast authorized Ms. Dirkse to utilize the corporate credit card for meals, transportation, and Korean language courses while in Korea. The use of the corporate card thus partially offset the significant obstacle to  accessing money and other basic necessities.

46.     In order to address these logistical challenges in the long-term, Alticast reassured Ms. Dirkse that it would provide a work visa for her, which would allow her to obtain a Korean phone plan and ATM card in order to directly and conveniently access her money.   Alticast also promised to provide Ms. Dirkse long-term housing with a computer monitor and a kitchen.

47.     Unfortunately, shortly after Ms. Dirkse agreed to stay in Korea on a long-term basis, Alticast advised her that she could no longer book travel directly using the corporate credit card. This change made Ms. Dirkse the only American employee not allowed to book travel directly using the American corporate credit card.

48.     Shortly thereafter, Alticast entirely revoked Ms. Dirkse's use of the American corporate credit card. Instead, Alticast  re-issued Ms. Dirkse a Korean credit card with a limit of only $500.00. The American corporate card that  Alticast had previously provided to Ms. Dirkse had a $15,000 credit limit. Now, Ms. Dirkse found herself with a substantially smaller credit limit, which was not even enough to book a week in a hotel in Korea.

49.     Alticast instructed Ms. Dirkse that she could only use the Korean credit card for company team dinners or dinners with a client. Her food, transportation, and other travel expenses, which had previously been charged to the corporate card, were now her personal responsibility.

50.     Ms. Dirkse now had to use her personal bankcard for all expenses, which also incurred additional foreign transaction fees on all of her daily expenditures and cash withdrawals. These fees had been previously covered by Alticast.

51.     Eventually, Alticast began paying Ms. Dirkse in Korean won rather than U.S. dollars. Alticast said that this change was a necessary pre-condition to applying for her work visa. However, because Alticast did not immediately provide her a work visa, Ms. Dirkse could not obtain an ATM card from a Korean bank because she was viewed as a tourist, not a legal resident. Consequently, if the banks were closed or there was no English-speaking banker present, Ms. Dirkse had no way of obtaining funds from her account. Further, without legal

residency, Ms. Dirkse could not make internet purchases in Korea, a country where almost everything is purchased by internet. These additional burdens added stress and inconvenience to the hostile work environment Ms. Dirkse faced everyday in the Alticast office in Seoul.

52.     In the course of negotiating her stay in Korea, Mr. Jung had promised Ms. Dirkse more spacious and comfortable long-term housing.  Mr. Jung delegated the task of finding Ms. Dirkse suitable housing to Mr. Jang.  Unfortunately, as set forth in detail above, Mr. Jang had no intention of making Ms. Dirkse's life easier because he wanted to force her out of Alticast. After Ms. Dirkse reported Mr. Jang's unlawful treatment towards her, Mr. Jang retaliated against her by refusing to assist her as Mr. Jung had requested. Mr. Jang also disallowed his staff from assisting Ms. Dirkse in her apartment search. The Human Resources department subsequently advised Ms. Dirkse that there was no housing available for her near the Alticast office and that she only had two available housing options in all of Seoul, both in the far eastern outskirts of the city.  When Ms. Dirkse requested that she continue to stay at the Coatel, Human Resources advised her that this was no longer an option.   Ms. Dirkse reluctantly accepted housing at the Officetel, located approximately one hour from the Seoul office.  Thereafter, Ms. Dirkse was forced to endure a two-hour commute every day. This commute became four hours on the days when Ms. Dirkse attended her required Korean language course due to the course's location in the city.

53.     By contrast, unmarried Korean employees (as she was) are provided with company-paid accommodations in Seoul, near the city's historic center, less than thirty minutes from the office.  There, two employees share a four-bedroom apartment, living room, and kitchen.

54.     Making matters worse, in June of 2012, Alticast advised Ms. Dirkse that she was no longer allowed to work from home and that hours spent working outside the office on evenings and weekends would no longer be counted as 'work hours.' Prior to this advisement, Ms. Dirkse regularly worked from her apartment after work and on weekends, due to the demanding nature of her job, and had previously enjoyed compensated time for those hours. Alticast's refusal to continue to allow Ms. Dirkse to work from home  had a significant impact on Ms. Dirkse, who  was now forced to cover her own travel expenses and commute an additional two-hours each day.

55.     Alticast further advised Ms. Dirkse that she could no longer use work time to attend her Korean language courses, further altering Ms. Dirkse's work schedule.

56.     In July of 2012, Alticast's Korean office issued Ms. Dirkse's first paycheck in Korean won, subjecting it to Korea's fifteen percent national income tax.  Ms. Dirkse's paycheck was *also* subject to United States taxation as foreign income.  In order for Ms. Dirkse to avoid double taxation, she needed a contract from Alticast specifying that she intended to work in Alticast's Korean office for greater than one year, which Alticast refused to provide.

### *Alticast Refused to Take Necessary Steps to Obtain a Valid Work Visa on behalf of Ms. Dirkse*

57.     Throughout this time, Alticast also refused to take the necessary steps to obtain a valid work visa for Ms. Dirkse, a prerequisite to her signing a work contract in Korea and to her obtaining legal resident status.

58.     On March 13, 2012, Ms. Dirkse traveled between Seoul, Korea, and Tokyo, Japan, for a work trip.  When Ms. Dirkse attempted to check in for her flight from Tokyo and return to

Seoul, Korean Air agents interrogated her as to why she was utilizing a Korean tourist visa and had not been issued a Korean work visa because she did not have proof of a return ticket back to the US, which is a requirement for a tourist visa.  The agent forced Ms. Dirkse to wait while they contacted Korean immigration officials to verify that Ms. Dirkse would be allowed to enter the country, notwithstanding her lack of a long-term visa.

59.     Once Ms. Dirkse arrived at the Gimpo Airport in Seoul, Korea, Korean immigration authorities questioned her as to why she was in Korea.  Ms. Dirkse informed the authorities that she was an employee of Alticast working in Seoul.  The immigration officials admonished Ms. Dirkse, informing her that her tourist visa allowed her to travel on business, but not to work in Korea.  Ms. Dirkse explained that she was an employee of the U.S. branch of Alticast, but she was working for an unknown time in Seoul and that her company had submitted her visa paperwork.  The agent could find no record of Alticast's submission of an application for a work visa for Ms. Dirkse. Despite this, the agent admitted Ms. Dirkse into Korea on a tourist visa.  After that, Ms. Dirkse was consistently directed to secondary clearance when traveling to Korea, which involved lengthy explanations of her purpose and planned date of departure from the country.

60.     When Ms. Dirkse notified Alticast that her visa paperwork had not been submitted as promised, Alticast's Human Resources Department continued to give her the runaround, advising her that she needed to be paid from Alticast's Korean office in Korean currency before they could submit a work visa application on her behalf, but then failing to pay her from Korea in order to effectuate the application.

61.     Still concerned, Ms. Dirkse raised her visa concerns to Mr. Jung.  Mr. Jung

promised Ms. Dirkse that her visa paperwork would be completed within three weeks.

62.     Not only did Ms. Dirkse's work visa not arrive when it was promised, but Ms.

Dirkse learned that as late as July 2012 Alticast had *still* not submitted her work visa application,

causing Ms. Dirkse to question whether Alticast ever really intended to obtain a work visa on her

behalf.

63.     Because Alticast would not submit Ms. Dirkse's work visa paperwork, she never

entered into a work contract with the company in Korea, and, accordingly, the only way for Ms.

Dirkse to avoid double taxation in both Korea and the United States was to remain out of the

United States for 330 out of 365 consecutive days.

***Mr. Jang Continued His Campaign to Drive Ms. Dirkse Out of Alticast by Making the
Workplace Even More Hostile***

64.     Throughout this time, Mr. Jang persisted in his hostile treatment of Ms. Dirkse,

going out of his way to undermine her credibility with the company's other Korean workers.

65.     On July 13, 2012, Ms. Dirkse and Mr. Jang worked through the night with

approximately twenty other Alticast employees.  Mr. Jung had instructed Ms. Dirkse to take the

lead in answering a long and detailed proposal for a client, with Mr. Jang providing assistance

and staff.  After Ms. Dirkse gave instructions in English, Mr. Jang subverted her instructions in

Korean and ordered the Korean marketing employees to perform other, conflicting tasks.  Mr.

Jang also organized a team dinner for the 20 Alticast employees that were working through the

night, and purposefully excluded Ms. Dirkse from attending that dinner.  During the team dinner,

Mr. Jang drank a significant amount of alcohol and even brought alcohol with him back to the office.

66.     When Ms. Dirkse approached Mr. Jang, Mr. Jang yelled that the other Korean employees did not want to speak English with her, that they "hated" her, and they "don't like Americans!"  Aggressively, Mr. Jang stalkedMs. Dirkse into her office and confronted her, yelling that she should go back to America because no one liked having a "foreigner" in the office.  Mr. Jang continued to yell at Ms. Dirkse stating, "I hate you!  I want you to leave!  I want you to go back to America! Fuck You!"

67.     Alarmingly, Mr. Jang then trapped Ms. Dirkse behind her desk while continuing to scream at her.  When Ms. Dirkse asked him to leave her office, Mr. Jang shrieked, "This is not your office!" and physically blocked her from escaping.  When Ms. Dirkse again asked him to leave her office, Mr. Jang moved toward her and raised his hand, which was shaking, as if he might strike her.  Mr. Jang continued to hurl insults at Ms. Dirkse, ranting, "You are crazy. Don't you think you have a lot of social problems?  Don't you see that no one here likes you?  Everyone saw how you are in there.  Everyone hates you!"

68.     Fearful for her safety as Mr. Jang continued to advance on her, Ms. Dirkse told Mr. Jang that if he did not leave her office and let her pass she would have to file a formal report against him. Undaunted, Mr. Jang refused to let Ms. Dirkse leave, insisting, "I don't have to!  It's not your office!"  Ms. Dirkse was forced to push her way past Mr. Jang as he tried to stop her.  When Ms. Dirkse attempted to escape from her own office, Mr. Jang continued to berate her,

screaming, "You can file a report.  Even to CXO.  They like me.  I'll file a report that you hit

me!"  Mr. Jang's insults persisted as Ms. Dirkse opened the door and told him again to leave.

Finally, he left, yelling, "You suck it!"

### *Alticast Ratified Mr. Jang's Discriminatory Treatment of Ms. Dirkse*

69.    In fear for her physical safety, and at a loss as to how she could perform her job

effectively under these conditions, Ms. Dirkse reached out yet *again* to Mr. Jung.  On July 12,

2012, in a long email describing Mr. Jang's outrageous conduct, Ms. Dirkse pled for help:

> I cannot, though, continue to tolerate Wonseok [Jang]'s verbal abuse and physical
> aggression.
> …
> There needs to basic some basic standards of human decency and respect that we
> show one another; we don't all have to be friends at the end of the day, nor do we
> even have to like one another, but we do owe one another – senior, junior, man,
> woman, Korean, American – some basic respect and cooperation in our common
> goals.
>
> I'd really appreciate your help in trying to resolve this problem as soon as
> possible.

70.    Still, Alticast failed to appropriately respond.  Instead of taking either prompt or

effective remedial action to rectify what had clearly become a hostile work environment – and

potentially a dangerous one for Ms. Dirkse – Mr. Jung merely acknowledged that there were

"cultural differences related to personal space" and misunderstandings between Koreans and

Americans.

71.    Unsatisfied with Mr. Jung's refusal to take any action to protect her physical or

emotional safety, on July 17, 2012, Ms. Dirkse reached out to Alticast's U.S.-based Human

Resources Manager, Jenny Dennehy, reporting the incident and requesting a current copy of the

employee handbook.  Ms. Dirkse communicated the following to Ms. Dennehy:

> Also, between you and me, I had an issue in the past week with an employee here who had been verbally abusive toward me for some time ("I hate you," "I want you to go back to America," etc.), which escalated into him blocking me behind my desk last Friday and refusing to leave my office or let me pass; [sic] We were working a late deadline and he had been drinking (before, and in the office) and I was really afraid that the situation could get violent (he has had fights at work events in the past…)

> I've been discussing it with Thomas and I believe that he will make sure it improves, but I still have some concerns since we are working together really regularly for the time being and the **hostility is palpable**.  Since I am kind of in limbo between the US and HQ I don't really know what the next steps are if things continue to escalate but I don't think that Mr. Na [Alticast's Korean HR representative] and his team understand me very well when I speak to them, and I don't have any info on policies/procedures/etc. here since it is all Korean and not distributed to me.  So I appreciate any advice or help you have.

72.     Ms. Dennehy provided a copy of the Alticast Handbook, but apparently never read

it nor required Mr. Jang or Mr. Jung to do so.

73.     Indeed, by ignoring Ms. Dirkse's complaints of discrimination, hostile work

environment, and retaliation, Alticast violated its own handbook, which states, "Alticast, Inc. is

an equal opportunity employer.  This means that equal opportunity will be extended to all

individuals without regard for **race**, religion, color, **sex**, sexual orientation, **national origin**, age,

disability, veteran's status or any other status protected by federal, state or local law."  Further,

the employee handbook states that:

> Alticast Inc. strictly prohibits the harassment of any other person on any basis. This includes **race, sex, national origin**, religion, age, disability, sexual orientation, marital status and any other personal characteristics.  Actions, words, jokes or comments based on any of the latter characteristics will not be tolerated.

Harassment is defined as any behavior (verbal, physical or visual) that is reasonably considered unwelcome or offensive to another employee and/or creates an intimidating, hostile, or offensive work environment for any other employee.

An employee should immediately report any incident of sexual or other unlawful harassment to his or her supervisor. If the supervisor is unavailable, or the employee believes it would be inappropriate to contact that person, the employee should immediately contact Human Resources. Employees may raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of unlawful harassment will be subject to disciplinary action up to and including termination of employment.

74.     Despite Ms. Dirkse's repeated complaints that she was being discriminated and retaliated against and subjected to a hostile work environment, Alticast did nothing to remedy the situation and forced her out of the company, despite Alticast's policy that "[e]mployees may raise concerns and make reports without fear of reprisal."

75.     Instead of addressing Ms. Dirkse's concerns, as the Employee Handbook mandates, Ms. Dennehy expressed her regret that Ms. Dirkse was "having some troubles," but responded, "Since the issues involved a Korean employee and that you are consider [sic] to be transferred to Alticast HQ staff, Mr. Na and Thomas will be advised to take the appropriate steps in resolution of this matter." Still, nothing Alticast did nothing.

76.     Instead of reprimanding Mr. Jang, Mr. Jung suggested that it was up to Ms. Dirkse to smooth things over by taking Mr. Jang out drinking.

77.     When the issue with Mr. Jang still had not been resolved, Ms. Dirkse *again* reached out to Ms. Dennehy. On July 30, 2012, Ms. Dirkse wrote:

I think that we are slowly working out the contract and Visa issues and I will probably not be transferred completely for a couple of months, **but the other issue is unresolved and escalating**. I have given Thomas the name (Wonseok Jang) and at first when I talked to him he was very concerned (he knows about the

earlier invent with the fight and that he has had rage issues before) but his solution was that we should talk and go out drinking together. I tried to do as he asked but the conflict only continued and when I addressed it again with Tomas he told me that **he thought it was a cultural misunderstanding** about space because Wonseok "is very smart, and he had a heart of gold." Since that talk Wonseok has stopped communicating directly with me and is actively thwarting the flow of information to me. Thomas has only sent me on email and seems to be angry that the situation was not resolved by dinner and drinks. He told me that he and Wonseok have been friends for 10 years in our last discussions and that he is sure that he doesn't mean any harm, but **I disagree and think that the situation is not being handled, and that I am being punished for addressing it**.

I would appreciate any help that you can give me; Mr. Na is good friends with Wonseok as well and I don't really feel like I can talk to him about the issue since he doesn't seem to understand my English well and I am concerned that given his role in relation to Thomas's, that it will only exacerbate the situation, not resolve it.

78.    Despite knowing that Ms. Dirkse still had not completed her transition to the Korean office, Ms. Dennehy responded, "I understand that you still have some concerns based on your email and I want to get you to the right person in Korea to speak to."

79.    Again, on July 31, 2012, Ms. Dirkse reached out to Mr. Jung stating, "I don't want this to continue to escalate and it is really difficult to do my job effectively if the constant conflict and duplication are going to be allowed to persist. As I said last week, I would appreciate you meeting with me and Wonseok and clarifying the roles very distinctly or arranging things otherwise so that there is not so much overlap."

80.    Mr. Jung's only response was, "I will see what I can."

81.    Mr. Jang's hostility toward Ms. Dirkse continued to escalate.

82.     During a series of meetings that Ms. Dirkse requested and intended to lead, Mr.

Jang interrupted the meeting in Korean and refused to speak English during the meetings.

According to Mr. Jang, the other Alticast employees no longer wanted to speak English with Ms.

Dirkse, despite their ability to do so and the company's prior promise to speak English at

business meetings involving Ms. Dirkse.

83.     Mr. Jang and Mr. Jung also stopped communicating directly with Ms. Dirkse

altogether, and prohibited other Alticast employees from communicating with her.  For example,

when Ms. Dirkse fell ill and needed to see a doctor, Jen Jeong, a Korean marketing team

member, went with Ms. Dirkse to the doctor to translate on her behalf.  Ms. Jeong was

subsequently punished by Mr. Jang for assisting Ms. Dirkse.

***Alticast Constructively Discharged Ms. Dirkse Through Its Discriminatory and Retaliatory
Conduct***

84.     Alticast then set out to constructively discharge Ms. Dirkse by making her work

environment so intolerable that the only fitting response was for her to resign.

85.     There are numerous customary ways in which  Alticast communicates to its

Korean workers that they are no longer desired at the company, and  must resign their

employment.  These ways include, but are not limited to, telling other Alticast employees that the

worker is going to be terminated; sending the Korean worker to a foreign office without their

family or under other inconvenient circumstances; taking away privileges from the Korean

worker; physically relocating the worker to a less prestigious or humiliating workspace; or

giving a high-ranking employee menial tasks, and removing authority, giving the worker a "do-

nothing" role within the company. The term "window seat" is used widely to describe this  "do-

nothing" role within the company, alluding not only to the new-found lack of authority, but also to degradation associated with a sex worker, who is for sale and looked at through a window on the street. Alticast has a well-established practice of moving unwanted employees to "window seats" and forcing their resignations.

86.     In Ms. Dirkse's case, Mr. Jang publicly disgraced and humiliated her at Alticast when he suggested that her office be turned into a storage space and demanded that she sit in a cubicle. Outside of work, but nevertheless in front of her Alticast co-workers, Mr. Jang likened Ms. Dirkse to a prostitute by taking her and her sister to a "hostess bar."

87.     In addition to taking away her office, Alticast engaged in numerous other unlawful practices in order to force Ms. Dirkse out of the company: Alticast never applied for Ms. Dirkse's work visa, and instead, stripped Ms. Dirkse of company benefits and privileges only after she had relocated to Korea.

88.     Although initially Alticast may have been unaware of Mr. Jang's harassment and discriminatory treatment toward Ms. Dirkse, when Ms. Dirkse reported Mr. Jang's unlawful actions, Alticast took neither prompt nor effective action to remedy the situation. Instead, Mr. Jung, who made no secret of his loyalty to and long-term friendship with Mr. Jang, let Ms. Dirkse know that it was incumbent on her to try and make Mr. Jang feel better by taking him drinking.

89.     Certainly, this total lack of accountability empowered Mr. Jang to further marginalize Ms. Dirkse, and ultimately Mr. Jung followed suit. Ms. Dirkse attempted, but was unsuccessful, at scheduling an appointment with the Korean Human Resources Department. She

was also unable to get any further assistance from the United States Human Resources Department.  Ms. Dirkse also reached out to Mr. Jung, who was "unavailable."

90.     Naturally, the stress, additional workload, lack of sleep, disrespect, humiliation, and fear associated with Mr. Jang's illegal treatment of Ms. Dirkse – and the fact that Alticast was unwilling to do anything to protect Ms. Dirkse – took a huge toll on her health and emotional well-being.  Ms. Dirkse's health problems were compounded by her living circumstances, far from the city center where English-speaking medical, banking and other facilities are located.

91.     Ultimately, Ms, Dirkse had no choice but to tender her resignation on August 10, 2012.

92.     Clearly, the reason for Ms. Dirkse's departure was no mystery to Alticast.  Indeed, Mr. Jung even acknowledged as much.  During a follow up conversation with Mr. Jung on August 12, 2012, Ms. Dirkse reiterated that the reason for her resignation was the increasing hostility in the office directed at her, including the fact that being an "American Director" seemed to be a lower rank than any Korean worker in the office, solely because Ms. Dirkse was an American woman working in Korea.  Mr. Jung responded, "I know.  I tried to make people nicer, but I think it's just a cultural difference."

93.     Additionally, on August 15, 2012, Ms. Dirkse followed up with Ms. Dennehy stating:

> As I think you know it is less a decision than the only option remaining to avoid continued bullying and conflict at work.  I never heard from JK, and Thomas has still done nothing to resolve the issue I brought up with you, but he is clearly

discussing it with Wonseok since every time I raise an issue with him there is **retaliation from Wonseok**. I am really sad to be leaving Korea and the company in many ways, **but it seems I have to choose between that or letting the stress of this situation continue, which is impacting my health, my happiness and my ability to do my job.**

94.     Still, Alticast did nothing to rectify its discriminatory and retaliatory conduct.

Alticast could have returned Ms. Dirkse to her former position in the United States, but instead,

Alticast accepted Ms. Dirkse's forced resignation in an effort to keep her from exposing

Alticast's unlawful employment practices.

95.     Only six days after Ms. Dirkse's forced resignation, Ms. Dennehy posted a

Technical Product Manager position located in the United States.

96.     Ms. Dirkse was more than qualified for the position.  In fact, in December of 2009

when Ms. Dirkse was negotiating a potential position at Alticast, Jeff Bonin had referred to Ms.

Dirkse's position as a 'Technical Manager of our Application Solutions business.'

97.     At the time of her forced resignation in 2012, Ms. Dirkse held the Director of

Technical Services position within the company.

98.     Instead of offering Ms. Dirkse the option to apply for the Technical Manager

position in the United States, Ms. Dennehy responded on September 7, 2012 as follows:

First, I am sorry that you feel you were forced to resign.  We have taken your concerns very seriously, feel that we responded appropriately, and made reasonable changes to the workplace on your behalf.  So I would like to make sure that you have resigned of your own free will, not forced to resign.

99.     Ms. Dennehy also made it clear that Alticast was not willing to offer her any

severance.

100.     Ms. Dirkse responded honestly making it absolutely clear that she had been constructively discharged, rather than leaving "of her own free will" as Ms. Dennehy tried to suggest:

> I think we have differing opinions on whether or not appropriate action was taken. From my perspective, the hostility continued to escalate through the end of my employment. **As you well know, I would not have resigned were it not for the ongoing and unresolved harassment from Wonseok [Jang] and as you also know I tried to resolve that again after my resignation in our conversation on 8/23 when you told me that there were no positions open in the US and that my position at HQ was terminated. Of course I am aware that the majority of work I was doing will now be handled from the US and that there are open positions, so, no, I don't think I had a choice and I do think I was forced out specifically because of the ongoing harassment issues.**

101.     Lest there be any doubt that Alticast did not take her concerns seriously, in a subsequent email, Ms. Dennehy informed Ms. Dirkse that an investigation "did not reveal any abnormalities with Mr. Wonseok's conduct towards you..."  In that same email, Ms. Dennehy accused Ms. Dirkse of raising a "new issue . . . based on your race and national origin only after the company would not offer you a severance," despite the indisputable evidence that Ms. Dirkse spoke out against Alticast's hostile work environment, discrimination, and retaliation well in advance of her forced resignation.

102.     In light of Ms. Dirkse's repeated efforts to resolve these issues over the course of months, Alticast's persistent denials are evidence that it simply turned a blind eye to the severe and pervasive discrimination and retaliation that ultimately led to Alticast's constructive discharge of Ms. Dirkse.

## VI.    STATEMENT OF CLAIMS FOR RELIEF[2]

### FIRST CLAIM FOR RELIEF
### Discrimination under 42 U.S.C. § 1981

103.    Ms. Dirkse hereby incorporates all allegations contained in this Complaint as though fully set forth herein.

104.    Title 42 U.S.C. § 1981 ("Section 1981") provides, in pertinent part:

(a)  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, to be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . .

(b)  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

105.    Ms. Dirkse is a Caucasian American woman, and is thus a member of a protected class under Section 1981.

106.    Ms. Dirkse is and has at all times been qualified to perform her job responsibilities and has met or exceeded expectations.

107.    Defendants denied Ms. Dirkse the protections against discrimination and retaliation provided by Section 1981 in the terms and conditions of her employment and in constructively discharging her wholly or in part based upon her race and national origin.

108.    Defendant Alticast (by and through the conduct of its agents and employees) discriminated against Ms. Dirkse in the making or enforcement of her employment contract, wholly or in part, because of her race and national origin.

---

[2] Upon the EEOC's issuance of a notice of Right to Sue, Ms. Dirkse anticipates adding claims of discrimination and retaliation pursuant to Title VII.

109.    Defendant Alticast is liable for the intentional acts and omissions of its agents and employees.

110.    Defendant Alticast's conduct was willful, wanton and in reckless disregard of Ms. Dirkse's federally protected rights, and was the proximate cause of significant injuries, damages and losses incurred by Ms. Dirkse.

### SECOND CLAIM FOR RELIEF
### Retaliation under 42 U.S.C. § 1981

111.    Ms. Dirkse hereby incorporates all allegations contained in this Complaint as though fully set forth herein.

112.    Ms. Dirkse engaged in activities and speech in opposition to employment practices prohibited by 42 U.S.C. § 1981, as amended.

113.    Defendants treated Ms. Dirkse more adversely than her similarly situated counterparts who did not voice their opposition to discrimination and/or harassment by Defendants.

114.    Ms. Dirkse was subjected to adverse treatment in her employment contract, including but not limited to being required to work in a hostile work environment which materially and adversely affected the terms and conditions of her employment, being subjected to disparate treatment because of her  race and national origin, being subjected to efforts to adversely affect the terms and conditions of her employment, being subjected to disciplinary and other retaliatory action, being terminated from her employment, and other discriminatory practices.

115.     Ms. Dirkse opposed Defendants' discriminatory treatment by reporting it to members of Defendant Alticast' management and Human Resource Departments, both in Korea and the United States, in compliance with official company policy.

116.     Defendants treated Ms. Dirkse differently than similarly situated employees who did not engage in protected opposition to discrimination as described herein.

117.     Alticast is liable for the acts and omissions of its agents and employees.

118.     Defendants, either directly or by and through their agents, retaliated against Ms. Dirkse and caused her severe injuries, damages, and losses.

119.     Defendants' retaliation included, but was not limited to, subjecting Ms. Dirkse to heightened scrutiny, subjecting her to more adverse terms of conditions of employment than her counterparts who did not express their opposition to discrimination, constructively terminating her employment, and other retaliatory conduct.

120.     Defendants' conduct was the proximate cause of Ms. Dirkse's injuries, damages, and losses.

121.     Defendants' conduct was engaged in with malice or with reckless indifference to the federally protected rights of Ms. Dirkse within the meaning of Section 1981.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law, including, but not limited to the following:

   a.   Declaratory, injunctive, and other equitable relief, as appropriate;

   b.   Actual economic damages as established at trial;

c.  Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.  Pre-judgment and post-judgment interest at the highest lawful rate;

f.  Attorney's fees and costs; and

g.  Such further relief as allowed by law or as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 9th day of August 2014.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*

_____

Mari Newman
Darold W. Killmer
Nicole B. Godfrey
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000

*Attorneys for Plaintiff*